UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AT&T MOBILITY, LLC, | No. 2:13-cv-0007-KJM-DAD |
| Plaintiff, | |
| v. | ORDER |
| GENERAL CHARLES E. "CHUCK" YEAGER (RET.), et al., | |
| Defendants. | |

On September 14, 2015, the court held an evidentiary hearing on the question of the competency of General Charles E. "Chuck" Yeager (Ret.) to proceed in this case without representation. General Yeager and Victoria Yeager appeared without counsel at that hearing, General Yeager representing himself and Victoria Yeager representing herself. Kennedy Luvai appeared by telephone on behalf of intervenor Parsons Behle & Latimer. For the following reasons, the court finds it must appoint a guardian ad litem to protect General Yeager's interests in this case.

I.   BACKGROUND

  A.   Procedural History

The court summarized the procedural history of this case in previous orders. *See, e.g.*, Order July 21, 2015, at 2–4, ECF No. 204. In short, General Yeager filed a complaint in this

court in 2007, alleging AT&T Mobility LLC and others used his name to promote their products without his permission. John Zarian and Kennedy Luvai, now of Parsons Behle, represented him at trial. After the trial, the jury awarded General Yeager $135,000. He was also awarded attorneys' fees and costs in excess of $170,000.

In January 2013, AT&T filed a complaint in interpleader in this court, depositing the verdict amount and fee award. It listed several adverse claims to those funds, including from General Yeager and several attorneys. Parsons Behle also intervened, asserting a claim to the interpleaded funds derived from unpaid legal fees incurred during the previous trial. A new trial nearly began on the fee dispute between Parsons Behle and General Yeager, but four days before the trial date, General Yeager and Parsons Behle notified the court they had settled. At that time, General Yeager was represented by another attorney, Parker White. However, General Yeager refused to sign the settlement agreement, declaring he had not agreed to its terms, and in October 2014, Parsons Behle sought an order enforcing settlement. ECF No. 128. That motion remains pending today.

Parker White withdrew as counsel for the Yeagers, and the court found the settlement agreement would be enforceable if he possessed authority to enter into it on General Yeager's behalf. Victoria Yeager intervened to defend her rights in the settlement agreement, and the court held an evidentiary hearing on Parker White's authority on March 24, 2015. General Yeager represented himself and Victoria Yeager represented herself.

B. Development of Concerns about General Yeager's Competency

General Yeager's demeanor and behavior at the March 2015 evidentiary hearing led the court to develop substantial questions about his competency. In particular, his demeanor and responses to the court's questions were markedly different from his demeanor and responses in the underlying AT&T trial. When asked at the end of the hearing whether General Yeager was competent to represent himself, Mrs. Yeager answered emphatically that he was not. The court therefore ordered the parties to respond to its concern that a hearing on General Yeager's competency was required. The parties submitted responsive briefs.

After careful consideration, the court concluded, "General Yeager 'may be suffering from a condition that materially affects his ability to represent himself or otherwise understand the nature of the proceedings.'" Order May 21, 2015, at 5, ECF No. 185 (quoting *United States v. 30.64 Acres of Land, More or Less, Situated in Klickitat Cnty., State of Wash. (Acres)*, 795 F.2d 796, 805 (9th Cir. 1986)). This conclusion was based on three points: (1) Mrs. Yeager believed General Yeager was not competent to represent himself; (2) General Yeager bore the burden at the evidentiary hearing to demonstrate Parker White had acted without authority, but General Yeager did not testify, called no witnesses, asked no questions of any witness, introduced no exhibits, made no objections, and expressed confusion when asked whether he would examine any witnesses; and (3) at the March 2015 hearing, General Yeager relied heavily on Mrs. Yeager's assistance, who wrote answers for him to repeat to the court. *Id.*

Because these facts raised substantial questions about General Yeager's competence, the court concluded it was bound to exercise its "legal obligation" under Federal Rule of Civil Procedure 17(c) to consider whether the appointment of a guardian or some other order was necessary to protect his interests in this case. *See id.* at 2 (citing *Allen v. Calderon*, 408 F.3d 1150, 1153 (9th Cir. 2005); *Acres*, 795 F.2d at 805; and *Krain v. Smallwood*, 880 F.2d 1119, 1121 (9th Cir. 1989)). The court set a hearing for June 2, 2015, at which General Yeager was to appear and (1) advise the court whether he would consent to the appointment of a guardian ad litem; (2) identify the names of two persons who are able to serve as guardian ad litem; and (3) explain each proposed guardian ad litem's qualifications and say whether each would consent to fulfilling that role. *Id.* at 6.

C. <u>Hearing on General Yeager's Consent to the Appointment of a Guardian Ad Litem</u>

The June 2, 2015 hearing went forward as scheduled. Minutes, ECF No. 193; *see also* Order, Aug. 11, 2015, ECF No. 205. General and Mrs. Yeager appeared, each pro se. General Yeager was provided with a headset to amplify the court's and the parties' speech. Court reporters also provided a simultaneous written transcription of the hearing, which was displayed on a screen General Yeager could see and read. A few minutes into the hearing, in an effort to

3

ensure General Yeager could hear and see the court and understand its questions, the court stepped down from the bench and stood at the lectern immediately in front of General Yeager.

General Yeager confirmed several times that he could hear the court's questions and could read them on the screen. When asked whether he understood the purpose of the hearing, he expressed confusion and did not respond. When asked whether he understood what a guardian or guardian ad litem was, he was again confused and did not answer. When asked whether he was willing to have the court appoint someone to assist him with the litigation, he said, "Next question." When asked again, he said he would appoint Mrs. Yeager. The court's previous order clarified that because Mrs. Yeager's interests in this litigation differ from those of General Yeager, she cannot be appointed as his guardian ad litem. Order May 21, 2015, at 6. When the court asked whether General Yeager would agree to the appointment of some other person, he did not respond.

Mrs. Yeager informed the court General Yeager had brought a written declaration to the hearing, and the court asked General Yeager whether he wanted to read it. He read the names of some of the parties in this case, apparently from the caption, and then read the following:

> I, Charles E. Yeager, declare I object to the court stopping me from assigning Victoria Yeager as guardian ad litem. I'm quite able to make decisions such as [whether] to settle and on what terms.

Order Aug. 11, 2015, at 3, ECF No. 205. General Yeager expressed surprise after reading these sentences and asked the court, "Are you objecting if Victoria helps me?" At least twice, the court asked General Yeager whether he wished to read or say anything else, and he responded that he did not.

The court concluded General Yeager did not, because he could not, consent to the appointment of a guardian. Recognizing that the appointment of a guardian ad litem might affect General Yeager's due process rights, the court ordered General Yeager to appear at a further hearing "prepared to answer the court's questions regarding his competence to proceed further without representation" and ordered him to submit "any evidence of his competence for the court's *in camera* review" before the hearing. *Id.* at 4–6.

4

D.  Competency Hearing and Evidence Presented

A hearing was set for August 25, 2015. *Id.* at 6. General Yeager submitted some evidence for the court's *in camera* review, including a letter from Colonel Matthew P. Wonnacott, M.D., General Yeager's personal physician. On the Yeagers' request, the hearing was reset for September 14, 2015, and the court ordered General and Mrs. Yeager to arrange for Colonel's Wonnacott's appearance at the hearing. Order Aug. 24, 2015, ECF No. 216. Mrs. Yeager claimed in an affidavit that General Yeager's hearing loss, not his mental capacity, was the source of the court's concerns and objected to the hearing. *See generally* V. Yeager Decl., ECF No. 214-1. For this reason, General and Mrs. Yeager were ordered to submit, no later than August 31, 2015, "[m]edical records documenting General Yeager's hearing loss, accompanied by affidavit(s) of treating physician(s) describing that hearing loss and its likely effects on General Yeager's ability to represent himself in this case." Order Aug. 24, 2015.

The court received no additional evidence, and the hearing went forward on September 14, 2015. General and Mrs. Yeager appeared, each pro se. Kennedy Luvai appeared by telephone for Parsons Behle. At the outset of the hearing, Mrs. Yeager hand-filed a printed copy of a one-page email from Kathy L. Smith-Amos, Au.D.,[1] dated August 31, 2015. The email is not sworn, and it does not appear Dr. Smith-Amos intended to give testimony, offer a formal expert opinion, or have her words be produced in court. For example, she addresses only Mrs. Yeager and does not refer to this or any lawsuit.

Dr. Smith-Amos wrote that she had reviewed General Yeager's "current hearing tests and the current settings in his hearing aids," which showed he suffered "moderate to profound hearing loss in both ears." She would expect this type of hearing loss to cause him "difficulty communicating in a courtroom environment even while wearing hearing aids or other amplification" and "difficulty following normal speech sounds especially middle and high frequency consonants." Mrs. Smith-Amos also wrote that she had "completed some quick

---

[1] The suffix "Au.D." designates a doctor of audiology. *See, e.g.*, *Garcia v. Astrue*, No. 10-56, 2011 WL 899652, at *3 (N.D. Ohio Mar. 14, 2011).

5

1  research" about an "appropriate interpreter for General Yeager's particular hearing situation."
2  She referred Mrs. Yeager to "businesses in the Sacramento area that provide services to hearing
3  impaired persons that do[] not include sign language," but did not name any specific organization.
4  Finally, she wrote, "As to your other requests for information regarding how a hearing impaired
5  person would react to legal jargon or how spouses are attuned to each other I do not have any
6  research available that would support what you are requesting."[2]

7  Upon review of this information, the court offered General Yeager its most current
8  Sennheiser wireless assisted-listening headsets,[3] the same used for jurors, witnesses, and parties
9  in other cases. The court's Americans with Disabilities Act (ADA) Coordinator, Yolanda Riley-
10 Portal, was present to provide General Yeager assistance with this equipment. He refused: "I
11 don't think it's necessary . . . . I don't think it will be necessary to use the hearing aids." Sept. 14,
12 2015 Hr. Rough Tr. (Rough Tr.) 3–4. The court also again provided General Yeager a
13 simultaneous written transcription of the proceedings, so that every spoken word was displayed
14 on a monitor directly before him. The court asked him several times to confirm he could read and
15 understand what was on the screen. In each instance he answered clearly that he could read and
16 understand. *Id.* at 4:5, 6:4–13, 7:19–8:4, 9:22–10:1.

17 The court then asked General Yeager several questions; he was not placed under
18 oath. In response, General Yeager could not answer why he was in court and could not recall the
19 date, year, or current President of the United States. *Id.* at 10–11. He could not describe how
20 documents filed on the docket in his name were prepared or how he signed them. *Id.* at 11–12.

---

[2] A copy of this correspondence is being filed on the court's docket concurrently with issuance of this order.

[3] This system is the same as that used in every court hearing. Each courtroom in the Eastern District of California is equipped with these hearing-impaired systems, which use infrared technology to transmit sound to headset users, including sound-enhanced versions of all court proceedings. *See* Eastern District of California, Interpreter/Hearing Impaired Systems, *available at* http://www.caed.uscourts.gov/caednew/index.cfm/attorney-info/court-interpreters/; *see also* Instruction Manual, Sennheiser Infrared Receiver HDI 830 (Oct. 2010).

Colonel Wonnacott was then called to the stand and was sworn in. He testified that he was a licensed medical doctor with a specialty in family practice. *Id.* at 13. His education included general training in audiology. *Id.* at 14. He has seen General Yeager approximately fourteen times. *Id.* at 17. In his opinion, General Yeager suffers from "severe hearing loss in both ears," but despite this hearing loss, General Yeager has always been able to answer the colonel's questions, including moderately difficult questions. *Id.* at 14, 18–19. Colonel Wonnacott confirmed his opinion that General Yeager is "clear and sharp in his understanding and capacity for appropriate medical, social, and quasi professional/legal decision making." *Id.* at 14.

The court asked Colonel Wonnacott how he could reconcile these opinions with General Yeager's responses to questions at the hearing so far, *i.e.*, his inability to recall the date, year, or President of the United States. *Id.* at 19–20. Colonel Wonnacott explained that General Yeager had appeared distracted, unable to concentrate, or that the simultaneous written transcription had been difficult to follow on the screen. *Id.* at 20; *see also id.* at 15 (the screen was "very helpful" but he was not sure "that the screen helps tremendously"). The court also asked Colonel Wonnacott what measures he believed would be most effective to overcome General Yeager's hearing impairment. *Id.* at 14–15. In his opinion, General Yeager had the best chance of understanding if his wife, Mrs. Yeager, were to repeat or relay any spoken information to him. *Id.* at 14–16. The court asked whether another person could perform the same task, and Colonel Wonnacott agreed that was possible, although he believed Mrs. Yeager would provide the most comprehensible assistance to General Yeager. *Id.* at 16–17.

Because Mrs. Yeager is a party to this action and represents herself, and because General Yeager is also a party and represents himself, creating a potential conflict, the court determined it could not allow Mrs. Yeager to paraphrase or "interpret" the spoken proceedings for General Yeager. The court informed the parties it would take a brief recess and confer with the ADA Coordinator about what services the court could provide. *Id.* at 20–23. No party objected. After the recess, the court informed the parties the ADA Coordinator had consulted with colleagues and had confirmed that the court could provide audio amplification, real-time written

7

1    transcription, or a third option along the lines suggested by Colonel Wonnacott: the ADA
2    Coordinator would sit beside General Yeager and consecutively repeat every question asked of
3    him, without amplification, word-for-word, in English.  *Id.* at 23–24.
4               The parties agreed to this third approach, and General Yeager confirmed he would
5    be able to understand the court's questions as repeated by the ADA Coordinator.  *Id.* at 25.  Using
6    this method of "consecutive English-to-English translation," *id.*, the court asked General Yeager
7    several additional questions.  In response, he did not recall the March 2015 hearing and did not
8    recall Parker White's testimony.  *Id.* at 26.  He could not recall the brief he filed after that
9    hearing, and did not respond when asked whether he knew how the brief was filed.  *Id.* at 26–27.
10   He was also unable to explain how he prepared, filed, and signed documents in this case or how
11   he had made the court aware of a matter.  *Id.* at 26–28.  When asked how he signed documents
12   filed with the court, he answered, "I don't know.  I usually do it with Julie, with my wife,"
13   apparently referring to Victoria Yeager.  *Id.* at 28.  Although General Yeager's electronic
14   signature has appeared on his filings in this case, he appeared not to be aware that documents may
15   be signed by electronic signature.  *See id.*  He could not recall the trial in the underlying AT&T
16   case.  He did however generalize this case accurately: "Basically, it's about money . . . how much
17   the lawyers get and how much we get."  *Id.* at 29.
18              The court then allowed Mrs. Yeager to testify in narrative format, under oath.  She
19   explained she had been unable to collect the evidence she wanted in advance of the hearing.  *Id.*
20   at 31–32.  She explained that in her understanding, a hearing-impaired person may not
21   comprehend spoken language despite its adequate volume.  *See id.* at 32–35.  She testified that
22   she and General Yeager "agree that [he] . . . should certainly have a guardian ad litem if I can't be
23   the person to help him . . . in courtroom hearings," but that "outside the courtroom for decisions
24   . . . [h]e is quite capable of making those decisions."  *Id.* at 36.  She explained her belief that
25   General Yeager was unable to answer questions about the date and current President because he
26   was not interested in those questions.  *Id.* at 38.
27              Mrs. Yeager also testified that "General Yeager relies on me to get briefs filed . . .
28   [a]nd I don't have him sit there to watch me do it."  *Id.* at 37.  "Once he's briefed on the orders,

8

1    and I wouldn't say that he always reads them verbatim, but he's briefed . . . [h]e relies on me to
2    get things done." *Id.*

3    After Mrs. Yeager concluded her testimony, General Yeager requested the
4    opportunity to "make a few comments." *Id.* at 39.  He told the story of his service as a fighter
5    pilot over Nazi-occupied France in the Second World War, how he was shot down but escaped
6    France to Spain, and how he remained there until he was freed in exchange for a barrel of
7    gasoline.  *Id.* at 39–41.  At moments he repeated what he had just said, suggesting some loss of
8    short-term memory.  The hearing then concluded.

9    II.    DISCUSSION

10   As discussed in previous orders, Federal Rule of Civil Procedure 17(c) requires the
11   court to appoint a guardian ad litem or to take "whatever measures it deems proper to protect an
12   incompetent person during litigation."  *Acres*, 795 F.2d at 805.  The court is under "legal
13   obligation" to consider whether an incompetent person is adequately protected.  *Id.*  The court's
14   obligation to appoint a guardian ad litem or to issue another appropriate order under Rule 17(c)
15   does not arise "until after a determination of incompetence has been made by the court in which
16   the issue is raised."  *Forte v. Cnty. of Merced*, No. 11-0318, 2013 WL 3282957, at *3 (E.D. Cal.
17   June 27, 2013) (citing *Ferrelli v. River Manor Health Care Ctr.*, 323 F.3d 196, 201 (2d Cir.
18   2003)) (emphasis omitted).

19        A.    Competence

20   A person's capacity to sue is measured by the standard of the law of his domicile,
21   Fed. R. Civ. P. 17(b)(1), here California state law.  "In California, a party is incompetent if he or
22   she lacks the capacity to understand the nature or consequences of the proceeding, or is unable to
23   assist counsel in the preparation of the case."  *Golden Gate Way, LLC v. Stewart*, No. 09-04458,
24   2012 WL 4482053, at *2 (N.D. Cal. Sept. 28, 2012) (citing *In re Jessica G.*, 93 Cal. App. 4th
25   1180, 1186 (2001); Cal. Civ. Proc. Code § 372; and *In re Sara D.*, 87 Cal. App. 4th 661, 666–67
26   (2001)).

27   Under California law, evidence of incompetence may be drawn from various
28   sources, but the evidence relied upon must "speak . . . to the court's concern . . . whether the

person in question is able to meaningfully take part in the proceedings." *In re Christina B.*, 19 Cal. App. 4th 1441, 1450 (1993). California law adopts a broad view of relevance, and a state court of appeal has emphasized a trial judge's "duty . . . to clearly bring out the facts." *In re Conservatorship of Pamela J.*, 133 Cal. App. 4th 807, 827–28 (2005). The court's first-hand observations of and interactions with the person may inform a court's decision. *See Guardianship of Walters*, 37 Cal. 2d 239, 249 (1951); *see also In re McConnell's Estate*, 26 Cal. App. 2d 102, 106 (1938). Likewise, a federal judge may elicit evidence by direct questioning. *See, e.g.*, *United States v. Lopez-Martinez*, 543 F.3d 509, 513 (9th Cir. 2008); *United States v. Larson*, 507 F.2d 385, 389 (9th Cir. 1974).

Federal courts in this circuit have found that a broad range of evidence may inform the court's decision: a report of mental disability by a government agency, *Acres*, 795 F.2d at 798; the sworn declaration of the person or those who know him, *Allen*, 408 F.3d at 1151; the representations of counsel, *Shankar v. United States Dep't of Homeland Sec.*, No. 13-01490, 2014 WL 523960, at *15 (N.D. Cal. Feb. 6, 2014); diagnosis of mental illness, *Allen*, 408 F.3d at 1151–52; *Elder-Evins v. Casey*, No. 09-05775, 2012 WL 2577589, at *10 (N.D. Cal. July 3, 2012); *Shankar*, 2014 WL 523960, at *15; a review of medical records, *Golden Gate Way*, 2012 WL 4482053, at *3; the person's age, illnesses, and general mental state, *id.*; and the court's own observations of the person's behavior, including the person's "manner and comments throughout the case" that suggest he does not "have a grasp on the nature and purpose of the proceedings," *id.*; *Zolnierz v. Arpaio*, No. 11-00146, 2013 WL 253870, at *2 (D. Ariz. Jan. 23, 2013).

Here, the court finds General Yeager lacks the capacity to understand the nature or consequences of the proceedings in this case and is unable to advance his interests or meaningfully participate. In several hearings, over several months, the court has observed his fading faculties. A man who does not recall a recent trial, recent evidentiary hearings, the court's orders, or at times his wife's name, not to mention the date, the year, or the President, should not be tasked with the *in propria persona* prosecution of an interpleader action in federal district court against those who were at one time his attorneys. His hearing impairment only magnifies his difficulty at this stage.

The court has contemplated Colonel Wonnacott's testimony but remains unpersuaded that General Yeager's difficulty in litigating his case is attributable to only hearing impairment, inattention, or distraction. In three hearings over the course of this year, General Yeager has demonstrated at best only a general understanding of this case, even when given time to review the written content of the docket. He has displayed no memory or comprehension of motions and applications that bear his signature. No evidence shows he was aware of the written declarations he purportedly made and filed. He does not know how to file a document in this case or even how to make the court aware of a fact. In each hearing, the court's questions to General Yeager were simply worded and slowly spoken. Furthermore, in each hearing he said he could understand. His answers were consistent with comprehension, but he was unable to respond a meaningful response. *See, e.g.*, Rough Tr. at 10 ("The Court: What is today's date? General Yeager: 23rd."); *id.* at 11 ("The Court: General Yeager, can you tell me who is the president of the United States currently? General Yeager: The president of the United States today? The Court: Yes. Do you know who that is? General Yeager: Yes, I understand the question, but I can't think of his name right now."). Finally, adopting the consecutive English-to-English translation method suggested by Colonel Wonnacott was not meaningfully effective in obtaining answers that reflected an understanding of the substance of these proceedings.

The problem with allowing this case to continue as it has is apparent from General Yeager's inaction at the March 2015 evidentiary hearing. The sole unanswered question in the dispute between General Yeager and Parsons Behle is Parker White's authority in late 2014 to settle the case. At the hearing in March 2015, which provided General Yeager the opportunity to produce the evidence required of him, he was unable to call witnesses, ask questions, introduce exhibits, make objections, give testimony, or adequately express his difficulty hearing and understanding spoken language. Mrs. Yeager understood this and urged the court to conclude he was not competent, only to retreat from that position when she understood it might require the appointment of a guardian ad litem. Although Mrs. Yeager now says she and the General would accept appointment, their acceptance is conditional on their ability – meaning Mrs. Yeager's ability – to identify and provide direction to the guardian.

11

The court finds it must exercise its Rule 17(c) duty to protect General Yeager's interests in this litigation.

B.  Appointment of a Guardian ad Litem

An incompetent person who does not have a "duly appointed representative," such as a conservator, *see* Fed. R. Civ. P. 17(c)(1), "may sue by a next friend or by a guardian ad litem," *id.* R. 17(c)(2). "The purpose of Rule 17(c) is to protect an incompetent person's interests in prosecuting or defending a lawsuit." *Davis v. Walker*, 745 F.3d 1303, 1310 (9th Cir. 2014). Rule 17(c)'s structure suggests an incompetent person's interests are normally protected by the appointment of a guardian ad litem, but that in some cases, "another appropriate order" may adequately protect the person's interests. *See* Fed. R. Civ. P. 17(c) ("The court must appoint a guardian ad litem--or issue another appropriate order--to protect a minor or incompetent person who is unrepresented in an action."). The court therefore first reviews the duties of a guardian ad litem, then considers whether an alternative to a guardian would better protect General Yeager's interests in this case.

1.  Duties of a Guardian ad Litem

First, a guardian ad litem is not a general guardian. *See, e.g.*, *Bacon v. Mandell*, No. 10-5506, 2012 WL 4105088, at *14 n.21 (D.N.J. Sept. 14, 2012). A general guardian is "[a] guardian who has general care and control of the ward's person and estate." Black's Law Dictionary (10th ed. 2014). A guardian ad litem, on the other hand, is "[a] guardian, [usually] a lawyer, appointed by the court to appear in a lawsuit on behalf of an incompetent or minor party." *Id.* "Ad litem" means "[f]or the purposes of the suit; pending the suit." *Id.*; *cf., e.g.*, *Brown v. Alexander*, No. 13-01451, 2015 WL 1744331, at *7 (N.D. Cal. Apr. 15, 2015) ("[T]he rules permitting a court to appoint a guardian ad litem exist for precisely the situation in which the child's interests are best served if he or she is represented by someone other than a custodial parent or other general guardian.").

Although a guardian ad litem has more limited powers than a general guardian, the appointment of a guardian ad litem "is more than a mere formalism." *Acres*, 795 F.2d at 805. A guardian ad litem "is 'appointed as a representative of the court to act for the [ward] . . . , with

12

authority to engage counsel, file suit, and to prosecute, control and direct the litigation. As an officer of the court, the guardian ad litem has full responsibility to assist the court to secure a just, speedy and inexpensive determination of the action.'" *Noe v. True*, 507 F.2d 9, 12 (6th Cir. 1974) (per curiam) (quoting *Fong Sik Leung v. Dulles*, 226 F.2d 74, 82 (9th Cir. 1955) (Boldt, D.J., concurring)). "For example, notwithstanding the incompetency of a party, the guardian may make binding contracts for the retention of counsel and expert witnesses and may settle the claim on behalf of his ward." *Acres*, 795 F.2d at 805; *see also Thomas v. Humfield*, 916 F.2d 1032, 1034 (5th Cir. 1990) ("The appointment of a guardian ad litem deprives the litigant of the right to control the litigation . . . ."); *Estate of Escobedo v. City of Redwood City*, No. 03-03204, 2006 WL 571354, at *9 (N.D. Cal. Mar. 2, 2006) ("Courts vest complete control in guardians to direct, manage and control litigation subject to judicial oversight that works as a further safeguard to protect the [ward] and makes sure any compromise is fair to the [ward] and in his or her best interest.").

A guardian ad litem's power is not unchecked. He or she acts under the court's supervision and is an officer of the court. *Neilson v. Colgate-Palmolive Co.*, 199 F.3d 642, 652 (2d Cir. 1999); *Dacanay v. Mendoza*, 573 F.2d 1075, 1079 (9th Cir. 1978). "[E]very step in the proceeding occurs under the aegis of the court." *Dacanay*, 573 F.2d at 1079. For example, although a guardian ad litem "may negotiate a proposed compromise to be referred to the court, he cannot render such a compromise effective merely by giving his consent. . . . It is the court's order approving the settlement that vests the guardian ad litem with the legal power to enforce the agreement." *Id.* (citations omitted). The court can remove or replace the guardian ad litem if he or she does not properly represent the ward's interests. *Neilson*, 199 F.3d at 652 (citing *Hull By Hull v. United States*, 53 F.3d 1125, 1127 n.1 (10th Cir. 1995), and *Garrick v. Weaver*, 888 F.2d 687, 693 (10th Cir. 1989)). This may be necessary if the guardian ad litem faces a conflict of interest, for example. *See, e.g.*, *Z.A. ex rel. K.A. v. St. Helena Unified Sch. Dist.*, No. 09-03557, 2010 WL 370333, at *4 (N.D. Cal. Jan. 25, 2010).

Finally, because "a non-lawyer 'has no authority to appear as an attorney for others than himself,'" if a guardian ad litem is not a lawyer, he or she must be represented in turn

13

by counsel. *See Johns v. County of San Diego*, 114 F.3d 874, 876–77 (9th Cir. 1997) (quoting *C.E. Pope Equity Trust v. United States*, 818 F.2d 696, 697 (9th Cir. 1987)).

### 2. Alternatives to a Guardian ad Litem

As a preliminary matter, Rule 17(c) refers to both a guardian ad litem and a "next friend." Traditionally, guardian ad litem and next friend were different offices. *See, e.g.*, *Dacanay*, 573 F.2d at 1076 n.1; 6A Charles A. Wright, et al., Fed. Prac. & Proc. Civ. § 1572 (3d ed.) ("Prior to the adoption of Federal Rule 17(c), . . . [a next friend] was empowered to bring suit on behalf of an infant or incompetent, whereas [a guardian ad litem] defended actions against the infant or incompetent."). In modern practice, however, the distinction is one of name only. *Ferrelli*, 323 F.3d at 198 n.1 (2d Cir. 2003); *see also K.T. v. Ramos*, No. 11-156, 2012 WL 443732, at *5 (D. Ariz. Feb. 13, 2012); *Nichols v. Nichols*, No. 10-651, 2011 WL 2470135, at *2–4 (D. Or. June 20, 2011).

The Ninth Circuit has suggested a stay may be an appropriate resolution in some cases. *Davis*, 745 F.3d at 1311 ("If the court determined that a stay order was still an appropriate solution, the court might have engaged in periodic case management conferences to reassess [the person's] competency or monitor his search for a guardian."). Here, it is unlikely General Yeager will find an attorney willing to represent him in this case, no matter how much time he is allowed for the search. He and Mrs. Yeager have not located counsel during the last year. It also appears unlikely General Yeager's condition will improve. A stay would not adequately protect his interests.

The appointment of counsel may serve as another alternative to the appointment of a guardian ad litem. *See, e.g., id.*; *Bacon*, 2012 WL 4105088, at *14; *Elder-Evins*, 2012 WL 2577589, at *2 (citing *Krain*, 880 F.2d at 1121). But the appointment of counsel here would not adequately address General Yeager's inability to recall or weigh the foundational facts of this case. Without the ability to comprehend, he could not "understand the nature or consequences of the proceeding, or . . . assist counsel in the preparation of the case." *Golden Gate Way,* 2012 WL 4482053, at *2.

As noted, Mrs. Yeager has recently requested the appointment of a guardian ad litem with "limited authority to facilitate proceedings in Court and litigation procedures." *See, e.g.*, Objections & Response 2, ECF No. 214; Rough Tr. 6. She has cited no authority to show such an appointment is possible, and the court has not located any. Assuming for sake of argument that this type of limited appointment were possible, the court would decline to pursue this option. A guardian with the limited authority Mrs. Yeager describes would be, as a functional matter, an appointed attorney or translator. Because the court finds an appointed attorney would not adequately protect General Yeager's interests, and multiple customized efforts at translation have been infective, a limited-authority guardian ad litem would also not adequately protect his interests.

For these reasons, the appointment of a guardian ad litem would best protect General Yeager's interests in this case. The court understands Mrs. Yeager's concern for her husband's best interests. After a guardian is appointed, if while recognizing her obligations under Federal Rule of Civil Procedure 11, she identifies an impropriety or conflict of interest, she may move for the guardian's disqualification. *See, e.g.*, *Z.A. ex rel. K.A.*, 2010 WL 370333, at *4–5. Alternatively, for example, she could oppose on her own behalf any compromise the guardian reaches. *See, e.g.*, *Dacanay*, 573 F.2d at 1079–80.

### 3.   Potential Guardians

A guardian ad litem need not possess any special qualifications. *See Burke v. Smith*, 252 F.3d 1260, 1264 (11th Cir. 2001); 6A Wright, *supra*, § 1572. Significant case law developed in the context of litigation by a next friend requires the person appointed to "be truly dedicated to the best interests of the person on whose behalf he seeks to litigate." *Whitmore v. Arkansas*, 495 U.S. 149, 163–64 (1990); *Coal. of Clergy, Lawyers, & Professors v. Bush*, 310 F.3d 1153 (9th Cir. 2002).[4] This rule comports with the conclusion of several courts that a

---

[4] Most case law on this question is decided in the habeas corpus context. *See, e.g.*, *Coal. of Clergy*, 310 F.3d 1153. Nevertheless, courts appear to apply the same test for the appointment of a next friend in habeas and non-habeas cases. *See, e.g.*, *Hoang Minh Tran v. Gore*, No. 10-2457, 2013 WL 692089, at *3 (S.D. Cal. Feb. 25, 2013) (applying *Whitmore* in a non-habeas case); *Nichols*, 2011 WL 2470135, at *2–3 (same).

1   guardian ad litem must not face an impermissible conflict of interest with the ward. *See, e.g.,*
2   *Burke*, 252 F.3d at 1264; *Z.A. ex rel. K.A.*, 2010 WL 370333, at *4; *Bhatia v. Corrigan*, No. 07-
3   2054, 2007 WL 1455908, at *1 (N.D. Cal. May 16, 2007). Courts also take comfort in a
4   candidate's "experience, objectivity, and expertise," *Nichols*, 2011 WL 2470135, at *4, or
5   previous relationship with the ward, *Golden Gate Way*, 2012 WL 4482053, at *3.
6   　　　　　Here, in previous filings, Victoria Yeager has proposed the names of three
7   potential guardians ad litem: Victoria Yeager, Jerry Karnow, and Tammy Karnow. *See*
8   Objections & Response 4, ECF No. 214. The court has determined Mrs. Yeager cannot serve as a
9   guardian given her separate potentially conflicting interests in this case.
10  　　　　　In addition to the court's prior observations, it notes that at the March 2015
11  evidentiary hearing, the court asked Mrs. Yeager whether General Yeager was able to protect his
12  own interests, independent from "hearing issues" and the "natural infirmities associated with
13  longevity." Hr'g Tr. 106, ECF No. 178. She answered then, "He is not able to represent himself
14  at all. In fact, I was just realizing that he actually did need to testify as to whether he authorized
15  Mr. White or not." *Id.* The court explained that could not be her decision, and she acknowledged
16  this: "I understand that. But he doesn't understand that either, and so he can't represent himself."
17  *Id.* After the court expressed concern that Rule 17(c) may require the appointment of a guardian
18  ad litem, however, *see* Order Mar. 26, 2015, ECF No. 169, Mrs. Yeager has argued that General
19  Yeager does indeed understand this case and that his difficulties are derived from his hearing
20  impairment, *see, e.g.*, Rough Tr. at 4:7–19. Her desire to shepherd this case on behalf of both
21  General Yeager and herself explains both her change of opinion and her acting as General
22  Yeager's de facto attorney here. *See, e.g.*, *id.* at 37 ("General Yeager relies on me to get briefs
23  filed . . . [a]nd I don't have him sit there to watch me do it. . . . Once he's briefed on the orders,
24  and I would say that he always reads them verbatim, but he's briefed . . . [h]e relies on me to get
25  things done."); *id.* at 26–28 (General Yeager is unable to recall a previous filing that bore his
26  signature); June 2, 2015 Hr'g Rough Tr. at 15 (General Yeager is unable to recall a declaration
27  that bore his signature).
28

1    Moreover, neither Karnow is a lawyer. Since November 2014, the Yeagers have
been unable to find an attorney to take on their case. *See* Opp'n Mot. Withdraw ¶¶ 4–5, ECF
No. 137. In the circumstances of this case, the court finds the appointment of either Karnow
would not accelerate the appointment of counsel. Because a non-lawyer guardian must secure
representation by counsel, *Johns*, 114 F.3d at 876–77, and because the events of the past year
suggest the Karnows will be unable to find counsel, the court declines to appoint either of them as
guardian ad litem for General Yeager.

III.    CONCLUSION

In conclusion, the court orders as follows:

(1) The appointment of a guardian ad litem is necessary to protect General Yeager's interests in this case.

(2) The court will identify a guardian ad litem in a separate order to follow shortly.

IT IS SO ORDERED.

DATED: November 10, 2015.

_____
UNITED STATES DISTRICT JUDGE